Vatché Chorbajian, Esq. (SBN 134271)
Email: vatche@vclegal.com
Alain Chorbajian, Esq. (SBN 323199)
Email: alain@vclegal.com
Chandler Michelotti, Esq. (SBN 343895)
Email: chandler@vclegal.com
John Chorbajian, Esq. (SBN 349558)
Email: john@vclegal.com
**LAW OFFICES OF VATCHÉ CHORBAJIAN, APC**
5531 Cancha De Golf, #107
Rancho Santa Fe, CA 92091
Telephone: (858) 227-7299
Facsimile: (858) 923-2124

Attorneys for Plaintiff
Goran Kirovski

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORAN KIROVSKI, an individual<br><br>Plaintiff,<br>vs.<br><br>ELI LILLY AND COMPANY, an Indiana Company<br><br>Defendants. | Case No.: '25 CV 2463 GPC JLB<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. STRICT LIBILITY – FAILURE TO WARN<br>2. STRICT LIABILITY – DEFECTIVE PRODUCT<br>3. BREACH OF EXPRESS WARRANTY<br>4. BREACH OF IMPLIED WARRANTY OF MECHANTABILITY<br>5. FRAUDULENT CONCEALMENT<br>6. FRAUDULENT MISREPRESENTATION<br><br>Judge:<br><br>JULY TRIAL DEMANDED |

## NATURE OF THE CASE

1.   This is an action for damages suffered by Plaintiff Goran Kirovski ("Plaintiff") after using the prescription drug Mounjaro for weight loss. Mounjaro is a prescription medication manufactured by Defendant Eli Lilly ("Defendant") that had been traditionally used to control blood sugar in adults with type 2 diabetes, but which has been increasingly prescribed for chronic weight management in non-diabetic patients.

2.   On information and belief, Mounjaro belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs") and its active ingredient is tirzepatide. Mounjaro and other GLP-1RAs work by targeting the body's glucose dependent insulinotropic polypeptide ("GIP") and Glucagon-like peptide- 1 ("GLP1") receptors to stimulate the release of insulin and suppress glucagon.

3.   Defendant deliberately marketed Mounjaro for weight loss in the United States because it understood the vast financial potential of such an endeavor, given the high obesity rates and concomitant cultural obsession with losing weight and being thin. Indeed, Defendant and other manufacturers of GLP-1RAs had already spent millions of dollars lobbying to have weight loss medications covered under public and private insurance, even before GLP-1RAs were approved for weight loss.

4.   Although Defendant has acknowledged the gastrointestinal events that are a well-known side effects of Mounjaro, it has failed to warn about other adverse events, such as non-arteritic anterior ischemic optic neuropathy (NAION) and its sequelae, which can result in blindness and permanent vision loss, and/or blurry and/or darkened vision, which may lead to falls and other injuries. Defendant has never provided adequate warnings about the risks of, among other things, NAION and its sequelae.

5.    Defendant aggressively marketed and widely advertised Mounjaro, including inducing physicians to prescribe Mounjaro, as an effective treatment for weight loss. Defendant undertook these advertising campaigns promoting the virtues of Mounjaro in order to induce widespread use of the product.

6.    The advertising, affirmation, misrepresentation and/or omissions, falsely and fraudulently sought to create the image and impression that the use of Mounjaro was safe for human use and had fewer side effects and adverse reactions than other methods of treatment for obesity and/or diabetes.

7.    Defendant purposefully minimized and understated health hazards and risks associated with Mounjaro. The Defendant, through literature and oral statements, deceived potential users of Mounjaro and their physicians by relaying positive information, including testimonials from satisfied users and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects of the drug. Defendant falsely and fraudulently withheld relevant information from potential users of Mounjaro.

8.    Defendant's effort to conceal (or minimize) the risks associated with Mounjaro, including the risk of NAION, was intended to create the impression that Mounjaro is a "miracle drug" for weight loss.

9.    Plaintiff would not have taken Mounjaro if he had been provided a full and clear warning of the true risks of taking it.

10. As a result of the foregoing, Plaintiff has suffered and was diagnosed with various forms of injury which were directly and proximately caused by his regular and prolonged use of Mounjaro. Plaintiff's injuries include, but are not limited to, non-arteritic anterior ischemic optic

neuropathy (NAION) and its sequelae, including loss of vision in the right eye and emotional distress, among other injuries.

11. On information and belief, Mounjaro must be taken weekly on a regular basis for an extended period of time to be effective. Because it is self-administered by the patient at home without the supervision of the prescribing physician, warnings about possible side effects are even more critical.

## PARTIES

12. Plaintiff is an adult individual who reside in San Diego, California.

13. Plaintiff is 53 years old. He used Mounjaro, as prescribed by his physician, for approximately eight months beginning on January 16, 2025.

14. Defendant, Eli Lilly and Company, is an Indiana company, with its principal place of business at 893 S. Delaware Street, Indianapolis, Indiana.

15. Defendant designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Mounjaro.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this action pursuant to 28 U.S.C.§ 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendant is incorporated and has its principal place of business in a state other that the state in which Plaintiff reside, which is California.

17. This Court has personal jurisdiction over Defendant, consistent with the United States Constitution and under the California long arm statute (Cal. Cod of Civ. Procedure § 410.10), as Plaintiff's claims arise out of Defendant's transactions of business and the tortious acts within

the State of California, and by virtue of Defendant's substantial, continuous, and systemic

contacts with the state of California unrelated to Plaintiff's claims.

18. Defendant Eli Lilly aggressively marketed Mounjaro in the United States, and in this

judicial district.

## FACTUAL ALLEGATIONS

**FDA's approval of Mounjaro.**

19. On information and belief, on September 14, 2021, Eli Lilly submitted NDA 215866

Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in

adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866.

20. On information and belief, on May 13, 2022, Eli Lilly announced the FDA's approval of

NDA 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve

glycemic control in adults with type 2 diabetes. In the press release, Eli Lilly disclosed a safety

summary and provided a link to the Medication Guide and Prescribing Information, but

gastroparesis and NAION were not identified as a risk.

**Defendant's marketing and promotion of Mounjaro.**

21. On information and belief, in May 13, 2022, Eli Lilly announced approval of Mounjaro,

proclaiming "Mounjaro's safety ... in a broad range of adults with type 2 diabetes."

22.  On information and belief, at all relevant times, Eli Lilly was in the business of and did

design, research, manufacture, test, advertise, promote, market, sell, and/or distribute Mounjaro.

23. On information and belief, on October 6, 2022, Eli Lilly announced that the FDA had

"granted Fast Track designation for the investigation of tirzepatide" to treat obese or overweight

adults.

24. On information and belief, in the fall 2022, analysts at UBS projected that Mounjaro could reach peak sales of $25 billion, asserting Eli Lilly's position in the multibillion-dollar obesity market.

25. On information and belief, in March 2023, it was reported that Eli Lilly kicked off a full-scale consumer campaign for Mounjaro after launching a digital campaign in January, including a 75-second TV spot supporting Mounjaro aired on FOX on February 12, the same day as Super Bowl LVII.

26. On information and belief, on April 11, 2023, the New York Times reported that Mounjaro was "gaining attention, with many people using it off-label to lose weight." The article described research which "found that Mounjaro may be even more powerful" than Ozempic, which it reported had recently "steamrollered through TikTok, talk shows and tabloids as people raved about using it off-label to lose weight." Although Eli Lilly denied promoting or encouraging "the off-label use of any of our medicines[,]" it was obvious to Eli Lilly and others in the industry that Mounjaro was following Ozempic's rising popularity for its weight loss effects. Furthermore, the same article also noted Eli Lilly's October announcement regarding the FDA's fast-track designation for its review of tirzepatide.[1]

**Introduction to Plaintiff's injuries: NAION and its sequelae.**

27. On information and belief, non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision, falling within the category of an eye stroke. The condition is irreversible and permanent. It is also untreatable and can lead to permanent blindness.

---

[1] Blum D, The Diabetes Drug That Could Overshadow Ozempic, The New York Times (published April 11, 2023, updated June 24, 2023) available at https://www.nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes.html (last visited on 8/24/23).

28. On information and belief, the condition is believed to be caused by insufficient blood supply or ischemia to the optic nerve.

29. On information and belief, NAION patients typically present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

30. On information and belief, the vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning. Some NAION patients lose complete vision with no recovery in affected eye(s). Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.

31. On information and belief, even reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, resulting in injuries from falls and accidents.

32. On information and belief, about 15% of patients who have NAION in one eye eventually develop it in their other eye.

**Defendant knew or should have known about the NAION risks of Mounjaro.**

33. On information and belief, Mounjaro and other GLP-1RAs are treated as a class by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

34. On information and belief, it has been known since at least 2016 that the human eye contains GLP-1 receptors. As such, Defendant knew or should have known of the causal

association between the use of GLP-1RA and the risk of developing NAION and its sequelae, but they ignored it.

35. On information and belief, the FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs. On information and belief, the earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[2]

36. On information and belief, a meta-analysis of all clinical trials of GLP-1RA drugs found a non-statistically significant increased risk of optic ischemic neuropathy.

37. On information and belief, numerous studies have concluded use of semaglutide increases the risk of NAION, even when multiple other factors have been taken into account.

38. For instance, on July 3, 2024, the Journal of the American Medical Association ("JAMA") Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[3]

39. The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic

---

[2] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse- event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

[3] Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."

40. A recent case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications.[4]

41. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[5]

**Defendant nonetheless failed to warn of the risks of NAION and its sequelae.**

42. Despite the growing number of articles, reports, and investigations, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Defendants GLP-1RA.

43. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the label.

44. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Mounjaro's label without any prior FDA approval.

45. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a

---

[4] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. JAMA OPHTHALMOL. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[5] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC MEDICINE (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information--such as that imparted by newly emerging literature like the litany of studies cited above--are considered a "moderate change." § 340.70(c)(6)(iii).

46. The Prescribing Information for Mounjaro discloses "Warnings and Precautions" and "Adverse Reactions" but does not adequately warn of the risk of NAION and its sequalae. The Mounjaro label lists nausea, diarrhea, decreased appetite, vomiting, constipation, dyspepsia, and abdominal pain as common adverse reactions only.

47. None of Defendant's additional advertising or promotional materials warned prescription providers or the general public of the risks of NAION, associated with GLP-1RAs.

48. Upon information and belief, Defendant knew or should have known of the causal association between the use of Mounjaro and the risk of developing NAION and its sequelae. Defendant's actual and constructive knowledge derived from their clinical studies, case reports, and the medical literature, including the medical literature and case reports referenced in this Complaint.

49. Upon information and belief, Defendant ignored the causal association between the use of Mounjaro and the risk of developing NAION and its sequelae.

50. Defendant's failure to disclose information that they possessed regarding the causal association between the use of Mounjaro and the risk of developing NAION, and its sequelae, rendered the warnings for Mounjaro inadequate.

51.  As a result of Defendant's inadequate warnings, the medical community at large, and Plaintiff's prescribing physician in particular, were not aware that Mounjaro can cause NAION,

nor were they aware that "common adverse reactions" listed on the label might be sequelae of NAION.

52. On information and belief, had Defendant adequately warned Plaintiff's prescribing physician that Mounjaro is causally associated with NAION, and its sequelae, then the physician's prescribing decision would have changed by not prescribing Mounjaro, or by monitoring Plaintiff's health for symptoms of NAION, and discontinuing Mounjaro when the symptoms first started.

**A physician prescribed Mounjaro series for Plaintiff's at-home, self-administration**

53. Plaintiff began taking Mounjaro on January 16, 2025. He self-administered subcutaneous shots of Mounjaro weekly for approximately eight months.

54. Plaintiff's physician originally prescribed a dosage of 2.5 mgs per week, then gradually increased the dosage to 5 mg, then to 7.5 mg. By late June/early July, the dosage was increased to 10 mg per week.

55. Although Plaintiff previously had no medical conditions related to his right eye or vision, on or about August 3, 2025, he lost vision in his right eye.

56. Plaintiff promptly contacted his doctor and visited Acuity Eye Group on August 5, 2025. On or about August 13, 2025, Plaintiff's doctor at Acuity Eye Group determined that Plaintiff has lost sight in his right eye.

57. The cause of Plaintiff's vision loss is Non-Arteritic Ischemic Optic Neuropathy ("NAION") as result of his Mounjaro use.

58. Plaintiff has since been unable to see from his right eye and he is at risk for developing the same condition in his left eye.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**The Sponsor of a drug is responsible for ensuring the safety of its drug and for warning.**

59.     The Sponsor of a drug is responsible for the safety of its product. A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

60.     The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

61.     The Institute of Medicine wrote the following in a report entitled The Future of Drug Safety: Promoting and Protecting the Health of the Public: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

62.     The FDA has insufficient resources to monitor the 11,000 drugs on the market. Whereas, manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has. Uncommon risks or those that appear as common conditions develop after long periods of time or have adverse impacts on special populations may go undetected in clinical trials.

63.     If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a

responsibility to investigate those risks and to provide necessary information healthcare providers.

64.     The following FDA standards govern a manufacturer's duty to warn: 21 C.F.R. § 201.57(c)(6): Warnings and precautions: "This section must describe clinically significant adverse reactions . . . the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established . . ."

65.     In addition, under 21 C.F.R. § 201.57(c)(6), the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards . . ."

66.     It is a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

67.     According to industry guidance on warnings from the FDA in 2011, "The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management."[6]

---

[6] U.S. Dept. of Health & Human Services, Food & Drug Admin., Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products Content and Format (Oct. 2011), at 5, available at https://www.fda.gov/files/drugs/published/Warnings-and-Precautions--Contraindications--and-Boxed-Warning- Sections-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and- Format.pdf.

68.     FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[7]

69.     By reason of the foregoing acts and omissions, Plaintiff was caused to suffer from NAION, and its sequelae, which resulted in severe personal injuries, physical pain, and mental anguish, including diminished enjoyment of life, and fear of developing any of the above-named health consequences.

## COUNT I
### Strict Liability - Failure to Warn

70.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

71.     California law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their product.

72.     At all times mentioned herein, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and/or distributed the Mounjaro that were used by Plaintiff.

73.     Mounjaro was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Defendant.

---

[7] Id. at 6.

74.    At all relevant times, and at the times Mounjaro left Defendant's control, Defendant knew or should have known that Mounjaro was unreasonably dangerous because Defendant did not adequately warn of the risk of NAION and its sequelae, especially when used in the form and manner as provided by Defendant.

75.    Despite the fact that Defendant knew or should have known that Mounjaro caused unreasonably dangerous injuries, Defendant continued to market, distribute, and/or sell Mounjaro to consumers, including Plaintiff, without adequate warnings.

76.    Despite the fact that Defendant knew or should have known that Mounjaro caused unreasonably dangerous injuries, Defendant continued to market Mounjaro to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

77.    Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of its failure to provide adequate warnings, as set forth herein.

78.    At all relevant times, given the increased safety risks, Mounjaro was fit for the ordinary purpose for which it was intended.

79.    At all relevant times, given the increased safety risks, Mounjaro did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

80.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Mounjaro into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous injuries, such as NAION and its sequelae.

81.     At all relevant times, Plaintiff was using Mounjaro for the purposes and in a manner normally intended--namely, for weight loss.

82.     Mounjaro, which was designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants, was defective due to inadequate warnings or instructions, as Defendant knew or should have known that this product created a risk of serious and dangerous injuries, including NAION and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, and Defendant failed to adequately warn of said risk.

83.     Mounjaro, which was designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendant knew or should have known of the risks of serious side effects, including NAION and its sequelae, as well as other severe and permanent health consequences from Mounjaro, it failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly advertise, market and/or promote Mounjaro.

84.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn of all possible adverse side effects causally associated with the use of Mounjaro, including the increased risk of NAION and its sequelae.

85.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

86.     The label for Mounjaro was inadequate because it did not warn and/or adequately warn of the severity and duration of adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

87.     Communications made by Defendant to Plaintiff and Plaintiff's prescribing physician(s) was inadequate because Defendant failed to warn and/or adequately warn of all possible adverse side effects causally associated with the use of Mounjaro, including the increased risk of NAION and its sequelae.

88.     Communications made by Defendant to Plaintiff and Plaintiff's prescribing physician(s) was inadequate because Defendant failed to warn and/or adequately warn that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae.

89.     Plaintiff had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and Plaintiff's reliance upon Defendant's warnings was reasonable.

90.     Plaintiff's prescribing physician had no way to determine the truth behind the inadequacies of Defendant's warnings as identified herein, and his/her/their reliance upon Defendant's warnings was reasonable.

91.     Upon information and belief, had Plaintiff's prescribing physician been warned of the increased risks of NAION and its sequelae, which are causally associated with Mounjaro, then the prescribing physician would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the dangers of Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Mounjaro.

92.    Upon information and belief, had Plaintiff's prescribing physician been warned that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, the prescribing physician would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Mounjaro so as to allow Plaintiff to make an informed decision regarding Plaintiff's use of Mounjaro.

93.    If Plaintiff had been warned of the increased risks of NAION and its sequelae, which are causally associated with Mounjaro, then Plaintiff would not have used Mounjaro and/or suffered from NAION and its sequelae.

94.    If Plaintiff had been warned that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION and its sequelae, then Plaintiff would not have used Mounjaro and/or suffered NAION and its sequelae.

95.    If Plaintiff had been warned of the increased risks of NAION and its sequelae, which is causally associated with Mounjaro, then Plaintiff would have informed Plaintiff's prescribers that Plaintiff did not want to take Mounjaro.

96.    Upon information and belief, if Plaintiff had informed Plaintiff's prescribing physician that Plaintiff did not want to take Mounjaro due to the risks of NAION and its sequelae, or the lack of adequate testing for safety risks, then Plaintiff's prescribing physician would not have prescribed Mounjaro.

97.    By reason of the foregoing, Defendant has become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of an unreasonably dangerous product, Mounjaro.

98.     Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendant is therefore liable for the injuries sustained by Plaintiff.

99.     Defendant's inadequate warnings for Mounjaro were acts that amount to willful, wanton, and/or reckless conduct by Defendant.

100.    Said inadequate warnings for Mounjaro were a substantial factor in causing Plaintiff's injuries.

101.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries, including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

102.    As a result of the foregoing acts and omissions Plaintiff did incur medical, health, incidental, and related expenses, and requires and/or will require more health care and services. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**COUNT II**
**Strict Liability – Defective Product**

103.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

104.    Defendant has engaged in the business of selling, distributing, supplying, manufacturing, marketing and/or promoting Mounjaro, and through that conduct has knowingly and intentionally placed Mounjaro into the stream of commerce with full knowledge that it would arrive where the Plaintiff purchased and ingested it. Defendant did in fact sell, distribute, supply, manufacture, and/or promote, individually and collectively, Mounjaro to Plaintiff, and Plaintiff's prescribing physician. Additionally, Defendant expected the Mounjaro they were selling, distributing and supplying, manufacturing and/or promoting to reach, and did in fact reach, prescribing physicians and consumers in this State and within each of the Plaintiff's home states, including Plaintiff, and prescribing physician, without substantial change in the condition of the product.

105.    The Mounjaro manufactured and/or supplied by Defendant was placed into the stream of commerce by Defendant in a defective condition in that the foreseeable risks exceeded the benefits associated with the design or formulation and/or that the Mounjaro was in a condition (a) that failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner, or (b) the risk of danger inherent in the design of Mounjaro outweighed the benefit of its design.

106.    Alternatively, the Mounjaro manufactured and/or supplied by Defendant was defective in design or formulation in that when it was placed in the stream of commerce, it was more dangerous than an ordinary consumer would expect, and it was more dangerous than other forms of treatment.

107.    The Mounjaro manufactured and/or supplied by Defendant was defective because Defendant knew or should have known that the product created a risk of harm to consumers and that Defendant failed to adequately warn of said risks.

108.    The Mounjaro manufactured and/or supplied by Defendant was defective due to one or more of the following reasons:

a.  The product was not safe for ingestion as designed in that it caused permanent and/or progressive physical injury and other physical injuries;

b.  The product as designed and/or sold by Defendant did not properly protect users from harm;

c.  The product caused Plaintiff to be exposed to harmful substances;

d.  The product was not safe for its intended use alone or in combination with other drugs known to be used in conjunction with the product;

e.  The product was not tested properly or adequately;

f.  The risk of product usage for known and/or intended uses was outweighed by the risk of usage;

g.  The product had an inadequate warning;

h.  Defendant failed its post-sale duty to warn of newly discovered harm;

i.  The product failed to perform as safely as an ordinary costumer would expect when used in an intended and reasonably foreseeable manner;

j.  The risk of danger inherent in the design of Mounjaro outweighed the benefit of its design; and/or

k.  The product was otherwise in a defective condition under California law.

109.    As designed the Mounjaro contained dangerous design defects and was not reasonably safe as intended making the risks of Mounjaro outweigh its benefits and subjecting Plaintiff to risks which exceeded any alleged benefits of Mounjaro.

110.     The Mounjaro manufactured and/or supplied by Defendant was defective due, inter alia, to inadequate post-marketing warning or instruction because after Defendant knew or should have known of the risk of injury from Mounjaro, they failed to provide adequate warnings to users of consumers of the product and continued to promote the product improperly.

111.     Plaintiff used the product for its intended and/or reasonably expected usage or purpose.

112.     As a proximate and legal result of the defective condition of this product manufactured and/or supplied by Defendant, Plaintiff was caused to suffer harm and the herein described injuries from the Plaintiff continue to suffer. Thus, Defendant's conduct proximately caused Plaintiff's injuries.

**COUNT III**
**Breach of Express Warranty**

113.     Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

114.     At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendant who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Mounjaro, which was used by Plaintiff as hereinabove described.

115.     At all relevant times, Defendant expressly warranted to Plaintiff and Plaintiff's prescribing physician that Mounjaro was safe as an adjunct to diet and exercise for weight loss.

116.     The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician by way of Mounjaro label, website, advertisements, promotional materials, and through other statements.

117.    As a result of Defendant's express warranties, Plaintiff's prescribing physician was induced to prescribe Mounjaro to Plaintiff, and Plaintiff was induced to use Mounjaro.

118.    At all relevant times, Defendant reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Mounjaro based upon its express warranties.

119.    At all relevant times, Defendant reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician, would recommend, prescribe and/or dispense Mounjaro based upon its express warranties.

120.    At all relevant times, Defendant knew or should have known that Mounjaro was unreasonably dangerous because of its increased risk of NAION, and its sequelae, especially when the drug was used in the form and manner as provided by Defendant.

121.    At all relevant times, Defendant knew or should have known that Mounjaro had not been sufficiently and/or adequately tested for safety.

122.    The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

123.    The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician, with the ordinary knowledge common to prescribing physicians as to the drug's characteristics.

124.    At the time Mounjaro left Defendant's control, it did not conform to Defendant's express warranties because Mounjaro was not safe to use as an adjunct to diet and exercise for weight loss, in that it was causally associated with increased risks of NAION, and its sequelae.

125.    The express warranties made by Defendant regarding the safety of Mounjaro were made with the intent to induce Plaintiff to use the product and/or Plaintiff's prescribing physician(s) to prescribe the product.

126.    Defendant knew and/or should have known that by making the express warranties to Plaintiff and/or Plaintiff's prescribing physician, it would be the natural tendency of Plaintiff to use Mounjaro and/or the natural tendency of Plaintiff's prescribing physician to prescribe Mounjaro.

127.    Plaintiff and Plaintiff's prescribing physician, as well as members of the medical community, relied on the express warranties of Defendant identified herein.

128.    Had Defendant not made these express warranties, Plaintiff would not have used Mounjaro and/or, upon information and belief, Plaintiff's prescribing physician would not have prescribed it.

129.    Plaintiff's injuries and damages were directly caused by Defendant's breach of the aforementioned express warranties.

130.    Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by Plaintiff.

131.    Accordingly, Defendant is liable as a result of its breach of express warranties to Plaintiff.

132.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION, and its sequelae, as well as other severe and personal injuries which are permanent and lasting in nature, including physical pain, mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment,

monitoring and/or medications, and fear of developing any of the above-named health consequences.

133.    By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Mounjaro.

134.    As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## COUNT IV
## Breach of Implied Warranty of Merchantability

135.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

136.    At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Mounjaro used by Plaintiff.

137.    Mounjaro were expected to and did reach the usual consumers, handlers, and persons encountering said product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendant.

138.    At all relevant times, Defendant impliedly warranted to Plaintiff, Plaintiff's prescribing physician(s), and the medical community that Mounjaro were of merchantable quality and safe and fit for its ordinary purpose.

139.    At all relevant times, Defendant knew or should have known that Mounjaro was unreasonably dangerous because of its increased risk NAION, and its sequelae, especially when the drugs were used in the form and manner as provided by Defendant.

140.    At all relevant times, Defendant knew or should have known that Mounjaro had not been sufficiently and/or adequately tested for safety.

141.    At the time Mounjaro left Defendant's control, it did not conform to Defendant's implied warranty and was unfit for its ordinary purpose because Defendant failed to provide adequate warnings of the drug's causal association with increased risk of NAION, and its sequelae.

142.    At all relevant times, Defendant reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician would recommend, prescribe and/or dispense Mounjaro for use by their patients to improve promote weight loss, among other uses.

143.    At all relevant times, Defendant reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Mounjaro for its ordinary purposes.

144.    Despite the fact that Defendant knew or should have known that Mounjaro cause unreasonably dangerous injuries, such as NAION, and its sequelae, Defendant continued to market, distribute, and/or sell Mounjaro to consumers, including Plaintiff, without adequate warnings.

145.    The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drug's characteristics.

146. The unreasonably dangerous characteristics of Mounjaro were beyond that which would be contemplated by Plaintiff's prescribing physician, with the ordinary knowledge common to prescribing physicians as to the drug's characteristics.

147. Plaintiff reasonably relied on Defendant's implied warranties of merchantability relating to Mounjaro's safety and efficacy.

148. Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Mounjaro was of merchantable quality and safe and fit for its intended uses.

149. Upon information and belief Plaintiff's prescribing physician relied on Defendant's implied warranties of merchantability and fitness for the ordinary use and purpose relating to Mounjaro.

150. Upon information and belief Plaintiff's prescribing physician, reasonably relied upon the skill and judgment of Defendant as to whether Mounjaro was of merchantable quality and safe and fit for its intended use.

151. Had Defendant not made these implied warranties, Plaintiff would not have used Mounjaro and/or, upon information and belief, Plaintiff's prescribing physician would not have prescribed it, and/or would have altered their prescribing practices and/or would have provided Plaintiff with adequate warnings regarding the dangers of Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Mounjaro.

152. Defendant herein breached the aforesaid implied warranties of merchantability because the drug Mounjaro were not fit for its intended purposes.

153. Defendant's breaches of implied warranties of merchantability were a substantial factor in causing Plaintiff's injuries.

154.    As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION, and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

155.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

**COUNT V**
**Fraudulent Concealment**

156.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

157.    At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Mounjaro, which was used by Plaintiff as hereinabove described.

158.    At all relevant times, Defendant knew that Mounjaro had not been adequately and/or sufficiently tested for safety.

159.    At all relevant times, Defendant knew that Mounjaro was unreasonably dangerous because of the increased risk of NAION, and its sequelae, especially when the drug was used in the form and manner as provided by Defendant.

160.     Defendant had a duty to disclose material information about Mounjaro to Plaintiff and Plaintiff's prescribing physician, namely that Mounjaro is causally associated with increased risk of NAION, and its sequelae, because Defendant has superior knowledge of the drug and its dangerous side effects, this material information is not readily available to Plaintiff or Plaintiff's prescribing physician by reasonable inquiry, and Defendant knew that Plaintiff and Plaintiff's prescribing physician would act on the basis of mistaken knowledge.

161.     Nonetheless, Defendant consciously and deliberately withheld and concealed from Plaintiff's prescribing physician, Plaintiff, the medical and healthcare community, and the general public this material information.

162.     Although the Mounjaro labels lists nausea, vomiting, diarrhea, abdominal pain, and decreased appetite as common adverse reactions reported in Mounjaro patients, the risk of NAION is not specifically mentioned.

163.     Defendant's promotional websites for Mounjaro similarly do not disclose that Mounjaro is causally associated with increased risk of NAION.

164.     Defendant's omissions and concealment of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician to dispense, provide, prescribe, accept, purchase, and/or consume Mounjaro for treatment of obesity.

165.     Defendant knew that Plaintiff's prescribing physician would prescribe, and Plaintiff would use Mounjaro without the awareness of the risks of serious side effects, including NAION, and its sequelae.

166. Defendant knew that Plaintiff and Plaintiff's prescribing physicians had no way to determine the truth behind Defendant's misrepresentations and concealments surrounding Mounjaro, as set forth herein.

167. Upon information and belief, Plaintiff's prescribing physician justifiably relied on Defendant's material misrepresentations, including the omissions contained therein, when making the decision to dispense, provide, and prescribe Mounjaro.

168. Upon information and belief, had Plaintiff's prescribing physician been warned of the increased risk of NAION causally associated with Mounjaro, they would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate information regarding the increased risk of NAION causally associated with it to allow Plaintiff to make an informed decision regarding Plaintiff's use of Mounjaro.

169. Upon information and belief, had Plaintiff's prescribing physician been told that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION, and its sequelae, they would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of Mounjaro.

170. Plaintiff justifiably relied on Defendant's material misrepresentations, including the omissions contained therein, when making the decision to purchase and/or consume Mounjaro.

171. Had Plaintiff been informed of the increased risks causally associated with Mounjaro, Plaintiff would not have used Mounjaro and/or suffered NAION, and its sequelae.

172. Defendant's fraudulent concealments were a substantial factor in causing Plaintiff's injuries.

173.    As a direct and proximate result of the above stated omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including NAION, and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

174.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## COUNT VI
### Fraudulent Misrepresentation

175.    Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

176.    At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Mounjaro, which was used by Plaintiff as hereinabove described.

177.    At all relevant times, Defendant knew that Mounjaro had not been adequately and/or sufficiently tested for safety.

178.    At all relevant times, Defendant knew of the serious side effects of Mounjaro, including NAION, and its sequelae.

179.    At all relevant times, Defendant knew that Mounjaro was not safe to promote weight loss, given the increased risk of NAION. Nonetheless, Defendant made material

misrepresentations to Plaintiff, Plaintiff's prescribing physician, the medical and healthcare community at large, and the general public regarding the safety and/or efficacy of Mounjaro.

180.    Defendant represented affirmatively and by omission on television advertisements and on the labels of Mounjaro that Mounjaro was a safe and effective drug for treatment for weight loss, despite being aware of increased risks of NAION, and its sequelae causally associated with using Mounjaro.

181.    Defendant was aware that its representations were false or misleading and knew that they were concealing and/or omitting material information from Plaintiff, Plaintiff's prescribing physician, the medical and healthcare community, and the general public.

182.    Defendant's misrepresentations of material facts were made purposefully, willfully, wantonly, and/or recklessly in order to mislead and induce medical and healthcare providers, such as Plaintiff's prescribing physician, and adults interested in weight loss, such as Plaintiff, to dispense, provide, prescribe, accept, purchase, and/or consume Mounjaro for weight loss.

183.    Upon information and belief, Plaintiff's prescribing physician had no way to determine the truth behind Defendant's false and/or misleading statements, concealments and omissions surrounding Mounjaro, and reasonably relied on false and/or misleading facts and information disseminated by Defendant, which included Defendant's' omissions of material facts in which Plaintiff's prescribing physician had no way to know were omitted.

184.    Upon information and belief, Plaintiff's prescribing physician justifiably relied on Defendant's material misrepresentations, including the omissions contained therein, when making the decision to prescribe Mounjaro to Plaintiff.

185.     Upon information and belief, had Plaintiff's prescribing physician been informed of the increased risk of NAION causally associated with Mounjaro, Plaintiff's prescribing physician(s) would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate information regarding safety of Mounjaro to allow Plaintiff to make an informed decision regarding Plaintiff's use of the drug.

186.     Upon information and belief, had Plaintiff's prescribing physician been told that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION, and its sequelae, they would not have prescribed Mounjaro and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Mounjaro so that Plaintiff can make an informed decision regarding Plaintiff's use of Mounjaro.

187.     Plaintiff had no way to determine the truth behind Defendant's false and/or misleading statements, concealments and omissions surrounding Mounjaro, and reasonably relied on false and/or misleading facts and information disseminated by Defendant, which included Defendant's omissions of material facts in which Plaintiff had no way to know were omitted.

188.     Plaintiff justifiably relied on Defendant's material misrepresentations, including the omissions contained therein, when making the decision to accept, purchase and/or consume Mounjaro.

189.     Had Plaintiff been told of the increased risk of NAION, and its sequelae causally associated with Mounjaro, Plaintiff would not have used Mounjaro and/or suffered NAION, and its sequelae.

190.     Had Plaintiff been told of the lack of sufficient and/or appropriate testing of Mounjaro for safety risks, including NAION, and its sequelae, Plaintiff would not have used Mounjaro and/or suffered NAION, and its sequelae.

191.     As a direct and proximate result of the above stated false representations and/or omissions as described herein, Plaintiff was caused to suffer serious and dangerous injuries including NAION, and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

192.     As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will require future medical and/or hospital care, attention, and services.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe personal injuries sustained by Plaintiff, health care costs, medical monitoring, together with interest and costs as provided by law;

2. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendant, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct;

3. Awarding Plaintiff the costs of these proceedings; and

4. Such other and further relief as this Court deems just and proper.


Dated: September 19, 2025               Respectfully submitted,

**LAW OFFICES OF VATCHÉ CHORBAJIAN, APC**

     */s/Vatché Chorbajian*
VATCHE CHORBAJIAN
Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all issues.

Dated: September 19, 2025                    Respectfully submitted,

**LAW OFFICES OF VATCHÉ
CHORBAJIAN, APC**

_/s/Vatché Chorbajian_
VATCHE CHORBAJIAN
Attorneys for Plaintiff